## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 8:08CV48 |
| *ex rel.* JOHN P. RAYNOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NATIONAL RURAL UTILITIES | ) | |
| COOPERATIVE FINANCE | ) | AMENDED MEMORANDUM |
| CORPORATION, NATIONAL RURAL | ) | AND ORDER |
| ELECTRIC COOPERATIVE | ) | |
| ASSOCIATION, RANDALL B. | ) | |
| JOHNSTON, DELOITTE TOUCHE | ) | |
| USA, LLP, SHELDON C. PETERSEN, | ) | |
| JOHN J. LIST, STEVEN L. LILLY, | ) | |
| GLENN L. ENGLISH, ERNST & | ) | |
| YOUNG LLP, MOODY'S CORP., | ) | |
| MOODY'S INVESTORS SERVICE, | ) | |
| INC., THE MCGRAW HILL | ) | |
| COMPANIES, INC., FITCH, INC., and | ) | |
| FITCH RATINGS, LTD., | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the Court on the Defendants' Motions to Dismiss the Third

Amended Complaint (Filing Nos. 117, 119, 121, 123, 130, 132, 134), filed by Defendants

National Rural Utilities Cooperative Finance Corporation, National Rural Electric

Cooperative Association, Sheldon C. Petersen, John L. List, Steven L. Lilly, Deloitte

Touche USA, LLP, Randall B. Johnston, Ernst & Young LLP, Moody's Corp., Moody's

Investors Service, Inc., The McGraw Hill Companies, Inc., and Fitch, Inc.  The Defendants

filed briefs in support of their motions, and Defendant National Rural Utilities Cooperative

Finance Corporation filed an extensive index of evidence.  The Relator Plaintiff John P.

Raynor ("Raynor") has responded to the Defendants' motions and the issues are now fully

briefed.  The Court has reviewed Raynor's Third Amended Complaint ("TAC") (Filing No. 36) and concludes that the Motions should be granted, and this case should be dismissed.

## BACKGROUND

For purposes of the pending Motions to Dismiss, the factual assertions in the TAC are accepted as true, although the Court need not accept the Plaintiffs' conclusions of law. The TAC spans 165 pages and contains 564 paragraphs, many with multiple sub-paragraphs.  While many details have been omitted from the following summary of the TAC, the Court has given full consideration to the entire pleading.

### I.    The Parties

Raynor brought this *qui tam* action under the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)-(3)[1] on behalf of the United States of America, claiming to have knowledge of Defendants' activities that have resulted in fraud upon the United States.  Raynor developed his knowledge through analysis of Defendant National Rural Utilities Cooperative Finance Corporation's ("CFC") financial statements, Securities and Exchange Commission filings, and other sources.  Raynor also has served as a board member of Innovative Communication Corporation ("ICC"), a company with which CFC has had business dealings.  CFC is a non-profit financing cooperative that lends funds directly to rural electric utilities, and indirectly to rural telephone companies, through Rural Telephone Finance Corporation ("RTFC"), a taxable cooperative under the dominion and control of CFC.  CFC is controlled by the electric rural utilities companies that are members of

---

[1] Congress amended each of these sections in 2009, and the applicability of the 2009 amendments is addressed throughout the discussion section of this Order.  The TAC only references the prior versions of 31 U.S.C. § 3729(a)(1)-(3).

Defendant National Rural Electric Cooperative Association ("NRECA") and its board. NRECA represents the interests of cooperative electric utilities with a special emphasis on seeking federal government economic support for rural electric utilities. Defendant Sheldon C. Petersen ("Petersen") is the chief executive officer of CFC and RTFC. Defendant John L. List ("List") is the senior vice president and general counsel of CFC and RTFC. Defendant Steven L. Lilly ("Lilly") is a senior vice president and chief financial officer of CFC and RTFC. Defendant Glenn L. English ("English") is the chief executive officer of NRECA and served on CFC's board from 1994 through 2005.

Deloitte Touche USA, LLP ("Deloitte") in an international accounting firm that has performed individual audits of CFC, RTFC, and the National Cooperative Services Corporation ("NCSC"); as well as consolidated audits for CFC, RTFC, and NCSC. Randall B. Johnston ("Johnston") is a partner at Deloitte. Defendant Ernst & Young LLP ("Ernst & Young") is also an international accounting firm that has performed audits of CFC, RTFC, and the NCSC. Ernst & Young's combined and consolidated audits of at least one of these entities occurred in each of the fiscal years 2002 through 2004.

Defendant Moody's Investors Service, Inc., ("MIS") is a division of Defendant Moody's Corp. ("Moody's") (collectively the "Moody's Defendants"). Both provide credit ratings, research, and risk analysis to investors. Defendant The McGraw Hill Companies, Inc. ("McGraw-Hill") also provide credit ratings, risk evaluations, and investment research and data to investors. Defendant Fitch, Inc. ("Fitch"), and its affiliate Defendant Fitch Ratings, Ltd. ("Fitch Ratings") (collectively the "Fitch Defendants") are credit rating agencies.

3

Several other non-parties play key roles in Raynor's claims under the FCA, including the government entities to whom CFC allegedly made false claims.  These government entities include the United States Department of Agriculture ("USDA").  Through the Rural Utilities Service, the USDA administers the Rural Economic Development Loan and Grant Program (the "REDLG Program"), a program that provides funding to rural projects through local utility organizations.  The USDA uses the Federal Financing Bank ("FFB") as an instrumentality to administer the REDLG Program.  Of relevance to this case, the FFB purchased $3.0 billion in bonds issued by CFC under the REDLG Program, in a series of transactions.

## II.    The Claims

The detailed factual allegations in the TAC purport to describe three false claims made to the government.  First, Raynor claims CFC fraudulently obtained $3.0 billion in loans from the FFB to CFC under the REDLG Program.  Raynor alleges that these loans were obtained fraudulently as a result of false and misleading financial statements and SEC filings.  CFC's fraudulent behavior went undetected by audits and led to an inflated credit rating.  The second claim comprises so-called "non-program" investments in CFC by the Federal Agricultural Mortgage Corporation ("Farmer Mac") in the form of a purchase of $435.6 million in electric distribution systems loans.  The third claim is made up of Farmer Mac's line-of-credit loans to CFC amounting to $1.675 billion, allegedly made outside Farmer Mac's authority.

### 1.  REDLG Program Loans and General Accounting Fraud

4

Raynor first claims that CFC fraudulently gained access to loans through the REDLG Program. CFC obtained loans under the REDLG Program in four steps. First, CFC submitted an application to the USDA's Rural Utilities Services Division ("RUS"). Next, the RUS approved CFC's application. Approval was followed by the issuance of a CFC bond to the FFB. Last, the USDA guaranteed the CFC bond. Federal statutes and regulations required that CFC receive an investment-grade rating from a rating agency, without regard to the USDA guarantee. Raynor claims that the investment-grade rating given to CFC by the Moody's Defendants, the Fitch Defendants, and others, was a result of accounting fraud. Raynor claims CFC committed accounting fraud by straying from Generally Accepted Accounting Principles ("GAAP") when reporting certain loan losses and income distributions on financial statements and SEC filings. CFC's misreporting revolved around three specific accounting events, which Raynor refers to as the CoServ Loan Loss, the ICC Loan Loss, and the Embezzlement Scheme.

The CoServ Loan Loss stems from a loan CFC made to Denton County Electric Cooperative, Inc. d/b/a CoServ Electric ("CoServ"). In May 2001 and 2002, CFC's loans to CoServ totaled 4.6 percent and 4.2 percent, respectively, of CFC's total loans and guarantees outstanding. As part of the restructuring plan in CoServ's bankruptcy, CoServ restructured its loans with CFC. The basis for Raynor's allegation of fraud is CFC's subsequent reporting of the restructured CoServ loan and foreclosed assets received. In sum, Raynor claims that CFC failed to recognize the CoServ Loan Loss in the manner required by GAAP. Raynor claims that CFC overstated the carrying amount of the CoServ loan on CFC's financial statements. At the end of fiscal year 2003, CFC had overstated the CoServ loan balance by over $260 million rather than charging it off as a bad debt

expense. Raynor contends that this bad debt expense should have been recognized by December 31, 2002. CFC also amortized the CoServ Loan Loss by recording all principal and interest received by CFC from CoServ as recovery of principal rather than reporting it as interest income. The TAC alleges that this improper amortization rendered each of CFC's financial statements through 2010 false and misleading. Raynor asserts that both these actions were material departures from GAAP. Raynor claims that, upon information and belief, had CFC properly recognized the CoServ Loan Loss, the loss would have caused the eventual collapse of CFC.

The ICC Loan Loss stems from the accounting treatment of a restructured loan by RTFC to Innovative Communication Corporation ("ICC"), which allegedly went unreported. The CFC loan to ICC represented 3 percent of CFC's total loan portfolio as of May 2001, and 3.2 percent of CFC's total loan portfolio in May 2003. ICC defaulted on the loan in 2001. Because of the default, and because there was no means to cure it, ICC and RTFC reached an agreement to restructure the loan in August 2001. The restructured loan required ICC to submit a larger number of subordinated capital certificates with each new loan, and reduced ICC's cash obligation for the next two years to interest only. Raynor claims CFC departed from GAAP because it did not report the ICC loan as restructured in its 2001 annual report. In April 2003, ICC and RTFC again restructured the loan. Raynor claims that CFC again misreported the restructured loans in violation of GAAP for fiscal years 2003 and 2004. Raynor also claims that CFC failed to report another loan loss involving ICC after foreclosing on ICC's restructured loans. Raynor alleges that under GAAP, CFC was required to charge-off the ICC Loan Loss by May 31, 2008, and that failing to do so was fraudulent and misleading.

6

The alleged Embezzlement Scheme involves CFC's combined or consolidated financial statements with RTFC. Raynor claims that a comparison of CFC's audited financial statements and RTFC's audited financial statements shows that CFC was embezzling income from RTFC and its members. Raynor alleges that CFC allocated RTFC's profit to other electric utilities affiliated with CFC. In essence, CFC allocates income generated by RTFC's loans to other electric utilities members of CFC. Raynor states that this practice is in violation of GAAP and CFC bylaws. This practice is known as "Segment Reporting Methodology," and as used by CFC, allegedly violates GAAP by concealing or disguising the source of income or ownership.

Based on these practices, Raynor claims that CFC's investment grade rating was the result of accounting fraud and that CFC did not engage in sound business practices. Thus, Raynor claims that CFC's access to funds under the REDLG Loan Program was the result of a false claim under th FCA.

## 2. Farmer Mac "Non-Program" Investments

Farmer Mac is a federally chartered instrumentality of the United States. *See* 12 U.S.C. § 2279aa-1(a)(1). As noted above, CFC's fraud involving Farmer Mac is split into two categories. First, are the "non-program" investments[2] in CFC made by Farmer Mac prior to the passage of the 2008 Farm Bill, also known as the Food, Conservation, and Energy Act of 2008[3], 12 U.S.C. § 2279aa(9)(C). These investments comprise several

---

[2] Raynor apparently refers to these particular investments in CFC as "non-program investments" because they are identified as such on Farmer Mac's SEC Forms 10K from the years 2005 through 2007.

[3] Codified as amended in scattered sections of 7, 12, 15, 16, 19, 20, 21, 25, 26, 40, & 42 U.S.C.).

loans that Farmer Mac purchased from CFC.[4]  Raynor first claims these investments were accessed, in part, using the fraudulent financial statements and SEC filings used to access REDLG Program loans.  Raynor also claims these investments were made in violation of federal regulations designed to preserve Farmer Mac's financial stability.  Specifically, Raynor states that the amount of the investments in CFC exceeded a regulatory limit placed on the amount of investment in a single entity, which in this case stood at $60 million. Section 652.35(d)(1) of 12 C.F.R prevents Farmer Mac from investing more than twenty-five percent of its regulatory capital in a single entity, issuer, or obligor.  Farmer Mac allegedly exceeded the regulatory constraint through its non-program investments in CFC.  Raynor also alleges that these investments in their entirety failed to meet regulatory marketability requirements.  Raynor alleges that because Farmer Mac exceeded the investment cap and the investments failed to meet marketability requirements, the investments are false claims under the FCA.

### 3. Farmer Mac "Program Investments"

The second category of false claims involving Farmer Mac are so called "program investments" in CFC made by Farmer Mac after passage of the 2008 Farm Bill.  Like the "non-program" investments, Raynor asserts that CFC's access to Farmer Mac funds were based in part on CFC's fraudulent financial statements and SEC filings.  Raynor also claims that more than $1.6 billion in post-2008 Farm Bill investments by Farmer Mac in CFC were unlawful.  The investments allegedly resemble line-of-credit loans to CFC and

---

[4] The total amount of the "non-program" investments is unclear from the organization of the TAC.  The introduction in the TAC totals the "non-program" investments at $435.6 million in electric distribution loans.  Paragraph 474 of the TAC totals the "non-program" investments at $1.34 billion.

8

Raynor claims such loans are forbidden by Farmer Mac's enabling charter. Raynor claims these types of loans would be *ultra vires* because Farmer Mac had no authority to provide line-of-credit loans when there was no intent by Farmer Mac to acquire a loan for an electric or telephone facility by a cooperative lender. Raynor concludes that, because Farmer Mac's investments in CFC ran contrary to Farmer Mac's statutory authority, the investments were false claims under the FCA.

## III.   Causes of Action

In Count One, Raynor alleges violations of 31 U.S.C. § 3729(a)(1). Raynor first alleges that Defendants CFC, Lilly, List, Petersen, NRECA, and English knowingly participated in a fraudulent course of conduct with the intent to defraud Farmer Mac. Prior to the 2008 Farm Bill, these Defendants allegedly caused Farmer Mac to invest in CFC's corporate debt obligations and to purchase loans from CFC in violation of federal regulations. After the 2008 Farm Bill, these Defendants allegedly caused Farmer Mac to provide CFC with lines of credit when Farmer Mac had no intent to acquire loans. Raynor states that these lines of credit were not permissible under Farmer Mac's statutory charter. Last, these Defendants allegedly induced the USDA to approve, and the FBB to purchase, CFC's bonds in contravention of federal law. Raynor states that these Defendants knew that Farmer Mac could not lawfully make direct and indirect investments in CFC regardless of the passage of the 2008 Farm Bill because the law only authorized the purchase of CFC loans. Further, Raynor claims that, because CFC operated with fraudulent financial statements, these Defendants knew that CFC was not eligible for the REDLG Program. Raynor claims these Defendants' actions resulting in access to Farmer Mac funding and the REDLG Program constitutes false claims under 31 U.S.C. § 3729(a)(1). In Count Two,

9

Raynor alleges, for the same reasons, that Defendants CFC, Lilly, List, Petersen, NRECA, and English violated 31 U.S.C. § 3729(a)(2).

In Count Three, Raynor claims that Defendants Ernst & Young, Deloitte, Johnston, the Moody's Defendants, and the Fitch Defendants, conspired with Defendants NRECA, English, CFC, List, Peterson, and Lilly in a fraudulent course of conduct to obtain a false claim from the federal government. Specifically, Raynor claims the Defendants conspired to have claims paid or approved by the USDA and the FFB under the guise of the REDLG Program, in contravention of applicable federal statutes and regulations, and by Farmer Mac. Raynor claims that Ernst & Young, Deloitte, and Johnston worried that they would be accountable for attesting to CFC's fraudulent financial statements if CFC's claims were not paid or approved. The Moody's and Fitch Defendants allegedly aided in getting the CFC's false claims paid by inflating CFC's ratings. Raynor claims that by assigning inflated and undeserved ratings to CFC, these Defendants would be exposed to liability to holders of the fraudulently issued debt. Raynor claims the actions of each of these Defendants represent a conspiracy to defraud in violation of 31 U.S.C. § 3729(a)(3).

The Defendants challenge the TAC under Rules 9(b), 12(b)(1), and 12(b)(6), on procedural and substantive grounds.

## STANDARDS OF REVIEW

**I.     Rule 9(b)**

10

Under the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Federal Rule of Civil Procedure 9(b), however, requires that fraud be alleged with particularity. The Eighth Circuit Court has described Rule 9(b)'s particularity requirement:

> Under Rule 9(b), the circumstances constituting fraud . . . shall be stated with particularity. Rule 9(b)'s particularity requirement demands a higher degree of notice than that required for other claims, and is intended to enable the defendant to respond specifically and quickly to the potentially damaging allegations. To satisfy the particularity requirement of Rule 9(b), the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result. Put another way, the complaint must identify the "who, what, where, when and how" of the alleged fraud.

*United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006) (internal citations omitted).

A plaintiff must state an underlying basis for its assertions sufficient to provide indicia of reliability. *Id.* at 557 (citing *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1013-14 (11th Cir. 2005)). While a plaintiff need not allege specific details of every alleged fraud, the plaintiff must provide some representative examples of the alleged misconduct. *Id.*

## II.   Rule 12(b)(1)

A motion pursuant to Fed. R. Civ. P. 12(b)(1) challenges whether the Court has subject matter jurisdiction to hear the matter. The party asserting jurisdiction bears the burden of proving that jurisdiction is proper. *V S Ltd. P'ship v. Dep't of Hous. and Urban Dev.,* 235 F.3d 1109, 1112 (8th Cir. 2000). The Court, however, has "wide discretion" to decide the process with which its jurisdiction can best be determined. *Johnson v. United States*, 534 F.3d 958, 964 (8th Cir. 2008) (quoting *Holt v. United States*, 46 F.3d 1000,

11

1003 (10th Cir. 1995)).  It "has the authority to dismiss an action for lack of subject matter jurisdiction on any one of three separate bases: '(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" *Id.* at 958 (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)); *see also Jessie v. Potter*, 516 F.3d 709, 712 (8th Cir. 2008) ("Motions to dismiss for lack of subject-matter jurisdiction can be decided in three ways: at the pleading stage, like a Rule12(b)(6) motion; on undisputed facts, like a summary judgment motion; and on disputed facts." (citing *Osborn v. United States*, 918 F.2d 724, 728-30 (8th Cir. 1990))).

### III.   Rule 12(b)(6)

Under the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations and citations omitted).   The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* Specifically, the complaint must contain "enough fact to raise a reasonable expectation that discovery will reveal evidence" to substantiate the necessary elements of the plaintiff's claim. *Id.* at 556.

When ruling on a defendant's motion to dismiss, a judge must rule "on the assumption that all the allegations in the complaint are true," and "a well-pleaded complaint

12

may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that recovery is very remote and unlikely.'" *Id.* (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).  The complaint, however, must still "include sufficient factual allegations to provide the grounds on which the claim rests." *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 473 (8th Cir. 2009).

"Two working principles underlie . . . *Twombly*.  First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 555).  "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1950 (citing *Twombly,* 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief will . . .  be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

"After *Twombly*, we have said that a plaintiff 'must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims, rather than the facts that are merely consistent with such a right.'" *Gregory*, 565 F.3d at 473 (internal omissions removed) (quoting *Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007)).

"While a plaintiff need not set forth detailed factual allegations, or specific facts that describe the evidence to be presented, the complaint must include sufficient factual allegations to provide the grounds on which the claim rests.  A district court, therefore, is not required to divine the litigant's intent and create claims that are not clearly raised, and

13

it need not conjure up unpled allegations to save a complaint." *Gregory,* 565 F.3d at 473 (quotations and citations omitted).

"If, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).

## DISCUSSION

The Defendants set forth numerous procedural and substantive grounds for dismissal of the TAC.  The Court will not address each of the procedural grounds because the TAC fails to state a claim upon which relief can be granted under the applicable sections of the FCA.  Further, even though the facts alleged in the TAC are numerous, they fail to identify the alleged fraud committed upon the United States with specificity, as required by Rule 9(b).

## I.    Failure to State a Claim Under Rule 12(b)(6)

Each cause of action asserted against each Defendant in the TAC is based on CFC's alleged false claims for payment.  Thus, if Raynor has failed to state that CFC submitted false claims to the government, he has failed to state a claim against the corresponding Defendants.

Raynor seeks damages and civil penalties under three subsections of the FCA, 31 U.S.C. § 3729(a)(1)-(3), *amended by* Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4(a)(1), 123 Stat. 1671, 1621-22 (2009).  The Court's analysis of each subsection addresses the extent to which the 2009 amendments apply to Raynor's claims.

14

As discussed below, however, the TAC fails to state a claim under either version of these subsections.

### a. Section 3729(a)(1)

Section 3729(a)(1)[5] creates liability for any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval."   "[U]nder the plain language of § 3729(a)(1), claims must be presented to an officer or employee of the government before liability can attach."   *United States v. Hawley*, 619 F.3d 886, 891-92 (8th Cir. 2010). However, claims may include a "request or demand that was originally made to a contractor, grantee, or other recipient of federal funds and then forwarded to the Government."   *Allison Engine Co. v. Unites States ex rel. Sanders*, 553 U.S. 662, 670 n.1 (2008).[6]  A prima facie case under § 3729(a)(1) requires proof that "(1) the defendant made a claim against the United States; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent."   *United States v. Basin Elec. Power Coop.*, 248 F.3d 781, 803 (8th Cir. 2001).   Nothing in the 2009 amendments to section 3729 suggests these requirements are altered.

---

[5] Congress amended § 3729(a) in 2009, but those changes only apply to conduct after May 20, 2009.  The amended section is codified at 31 U.S.C. § 3729(a)(1)(A), creates liability where a claimant "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  It is difficult to determine whether the TAC alleges a "claim" or fraudulent conduct as occurring after that date because Raynor refers to a continuing course of conduct.  The Court need not address this issue as its analysis is applicable under either version of the statute.

[6] The 2009 amendments incorporate these principles into the definition of a "claim."  31 U.S.C. § 3729(b)(2).

Even assuming CFC made claims against the government, the TAC does not explain how the claims were false, or that false claims were presented knowingly.  Raynor argues that claims may be false under the FCA through false statements, corrupt or fraudulent conduct, or violations of applicable statutes or regulations.  Accepting the allegations in the TAC as true, as the Court must at this stage of the proceedings, the Court still cannot determine that CFC's claims were false or fraudulent.  The Amended Complaint alleges three "false claims" to the government:  (1) loans from the FFB to CFC under the REDLG Loan Program; (2) so-called "program investments" made as line-of-credit loans by Farmer Mac to CFC; and (3)so-called "non-program" investments by Farmer Mac in CFC.  Because the TAC fails to state the objective falsity of each claim, it must be dismissed.

### 1.  Loans Obtained Under the REDLG Loan Program

Regarding CFC's access to the REDLG Loan Program, the Court first notes that certain allegations cast doubt on whether CFC's participation in the Program qualifies as a "claim" under the FCA, and whether its allegedly false application would be material to the federal government's financing decision.  The Supreme Court in *Allison Engine* held that FCA liability attaches to false statements that have a "material effect" on the federal government's decision to pay a claim.  *Allison Engine*, 553 U.S. at 673.  Despite Raynor's allegations that CFC was required to submit its allegedly false financial statements as part of its application to the REDLG Program, there is no allegation that the federal government relied on those financial statements in accepting CFC's application, or that CFC anticipated such reliance.  Further, the TAC does not specify how the fraudulent filings and financial statements affected the investment-grade rating assigned by the credit rating agencies.

16

Under either Rule 9(b) or Rule 12(b)(6), the lack of any allegation that the government or the credit agencies relied, or were expected to rely, on the allegedly false statements casts doubt on the reliability of Raynor's claims.

From the TAC, it is unclear whether CFC ever obtained funds from the federal government.  Raynor alleges that CFC fraudulently gained access to REDLG Loan Programs through the FFB.  The USDA guarantees these loans but the TAC does not suggest that the USDA directly finances them.  It is well established that false claims do not attach to a government guarantee until there has been a default.  *United States v. Eghbal*, 548 F.3d 703, 707 (9th Cir. 2008).  Raynor has not alleged any default by CFC to trigger the USDA guarantee.  Paragraph 29 of the TAC lists the government's loans to CFC as coming from Farmer Mac and the USDA.  In other places, the TAC describes the fraud as an inducement of the USDA to approve the REDLG Program loans. The TAC hints, but does not expressly allege, that funds from FFB also should qualify as funds from the federal government because it is an "instrumentality of the federal government."  Thus, to the extent that CFC made false claims against the USDA, Raynor's allegations must fail because there has been no default.

Even assuming CFC's financial statements were instrumental material in enabling it to obtain federal funds, Raynor has failed to allege objective falsity.  The common element in each of Raynor's claims is that CFC gained access to loan funds through falsified financial statements and misreporting on securities documents, all a result of departures from GAAP.  It is true that fraudulent loan applications to the federal government may qualify as claims under the FCA.  *United States v. Neifert-White Co.*, 390 U.S. 228, 233 (1968)).  However, Raynor must still establish that each claim was false or

fraudulent.  For a claim to be false under the meaning of the FCA, it cannot be potentially false, it must be objectively false.  *See United States ex rel. Hixson v. Health Mgmt. Sys., Inc.*, 613 F.3d 1186, 1191 (8th Cir. 2010) ("As we have said, to prevail here the relators must show that there is no reasonable interpretation of the law that would make the allegedly false statement true"); *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 378 (4th Cir. 2008) (claims under the FCA "surely cannot be construed to include a run-of-the-mill breach of contract action that is devoid of any *objective* falsehood") (emphasis added).  Faulty calculations, flawed reasoning, and imprecise statements or differences in interpretation of a disputed or unclear legal question are not false under the FCA.  *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999).  The Eighth Circuit has stated that "innocent mistakes and negligence are not offenses under the [FCA] . . . In short, the claim must be a lie."  *United States ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 767 (8th Cir. 2002) (quotations omitted).

Raynor alleges CFC gained access to REDLG loan funds by covering up significant loan losses and an embezzlement scheme, and misreporting loan information.  Each of these allegations is based on the assumption that CFC violated any reasonable interpretation of the law.  For example, Raynor claims that CFC embezzled hundreds of millions by improperly reporting income earned by RTFC through "segment misreporting methodology."  As it relates to the FCA, Raynor claims that CFC's segment misreporting methodology intentionally departs from GAAP for the purpose of concealing the embezzlement scheme.  Regarding the CoServ loan loss, Raynor claims the false statements were a result of CFC's failure to follow GAAP in amortizing the loan loss.  In essence, the Complaint states that "upon information and belief" CFC attempted to avoid

18

recognizing the CoServ loan loss and to smooth out earnings by recognizing the loss over a period of time.  (See Complaint, Filing No. 36, ¶ 221.)  Similarly, regarding the ICC Loan Loss, Raynor claims CFC misreported the restructured loans and failed to charge-off appropriate losses. Thus, the gravamen of the allegations are GAAP violations resulting in access to federally backed loans and an improved credit rating.

"GAAP 'are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions. [GAAP], rather, tolerate a range of reasonable treatments, leaving the choice among alternatives to management.'" *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 890 (quoting *Thor Power Tool Co. v. C.I.R.*, 439 U.S. 522, 544 (1979)).  The Supreme Court has noted that "[t]here are 19 different GAAP sources, any number of which might present conflicting treatments of a particular accounting question."  *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101 (1995). Allegations of GAAP violations do not establish fraud claims without corresponding evidence of fraudulent intent.  *Kushner v. Beverly Enter., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003).

Even taking the hundreds of allegations in the TAC as true, they do not state objective falsity.   The allegations are devoid of any indication that Raynor's characterizations of GAAP principles were the only acceptable method under the circumstances. Other than conclusory statements, the TAC fails to indicate that CFC knowingly chose a particular accounting method solely to defraud the government.  Though the "intent" requirement of § 3729(a)(1) pronounced in *Allison Engine* was removed in the 2009 amendments to the FCA, the flexibility of GAAP suggests that intent, or at least knowledge that a chosen accounting method would result in a fraud, is required.  In sum,

19

nothing indicates that Raynor's allegations of GAAP violations are anything more than imprecise statements or differences in interpretation of a disputed or unclear legal question, neither of which are false claims under the FCA.  The flexibility of GAAP and the particular allegations in this case make it impossible to determine whether CFC's violations of GAAP resulted in objective departures from the truth.  Thus, the allegations do not permit the Court to assume that CFC's data and reports resulted in outright lies submitted to the government[7] for the purpose of obtaining payment.

### 2. Pre Farm-Bill Claims

To the extent Raynor alleges CFC's violations of GAAP influenced Farmer Mac, the TAC fails to state that CFC fraudulently submitted a claim for the reasons already discussed.  Raynor also claims the pre-2008 Farm Bill investments by Farmer Mac were false claims because Farmer Mac exceeded the cap on investment in a single entity placed upon it by the Code of Federal Regulations, and the investment failed to meet marketability requirements.  However, the TAC is devoid of any allegation or explanation as to how CFC induced Farmer Mac to breach these regulations, other than to state that had it not invested in CFC, CFC would have collapsed.  Thus, even assuming these allegations are true, they state no wrongdoing by CFC.  The regulations cited by the TAC place caps on Farmer Mac.  Without any supporting allegations, the Court cannot assume that CFC

---

[7] As a result of CFC's violations of GAAP, Raynor vaguely alleges that the contents of CFC's application under the REDLG Loan Program caused CFC's credit rating to be artificially inflated.  The TAC is void of allegations that credit rating agencies relied on the false financial statements in determining CFC's credit rating.  On that basis, the Court cannot assume that CFC's variation from GAAP improperly increased its credit rating and consequently resulted in access to loans from the federal government.  Therefore, Raynor has failed to state falsity under the former § 3729(a)(1).

somehow induced Farmer Mac to violate federal regulations and fund CFC.   Raynor has not established that CFC made a false claim or violated the law to induce Farmer Mac's pre-2008 Farm Bill investments.

### 3. Post Farm-Bill Claims

Similarly, Raynor has not stated that CFC submitted a false claim regarding the post-2008 Farm Bill investments.  Raynor claims Farmer Mac lacked statutory authority to make the post-2008 Farm Bill investments in CFC and lacked authority under its charter to make loan securitization transactions with CFC.  As these false claims relate to CFC, Raynor simply states, "In CFC's quest to survive at all costs, CFC has corrupted Farmer Mac and the Farm Credit Administration's regulatory arm."  However, the Complaint does not state how CFC corrupted Farmer Mac, and does not state how such corruption resulted in a false claim submitted to the government.  As with the pre-2008 Farm Bill investments, the TAC fails to state any wrongdoing on the part of CFC.

### b. Count Two Under Section 3729(b)(2)

Section 3729(a)(2) imposes FCA liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."   Congress has amended and recodified § 3729(a)(2), creating liability on the part of any person who "knowingly makes, uses, or causes to be made or used, a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B).  The amended version applies to FCA claims pending on or after June 7, 2008.  Pub. L. No. 111-21, § 4(f)(1), 123 Stat. 1617, 1625 (2009).  From the face of the TAC, it is difficult to determine whether any of Raynor's claims were pending on or after June 7, 2008.  However, the Court need not resolve that issue because the TAC fails to state a claim

under either version for the same reasons its claims fail under the former § 3729(a)(1). The Complaint, despite its length, fails to allege the Defendants knowingly made or used a false claim.  For the same reasons stated above, Raynor fails to allege that CFC's access to the REDLG Loan Program or access to Farmer Mac were the result of outright lies or fraudulent behavior.  Thus, it cannot be said that CFC, or any of the Defendants, knowingly caused to be made a false or fraudulent statement.

### c. Count Three Under Section 3729(a)(3)

Section 3729(a)(3), recodified as amended at §3729(a)(1)(C), creates liability for those who conspire to make false claims to the government.  Section 3729(a)(3) "requires evidence of an agreement to defraud the government."  *Hawley*, 619 F.3d at 896.  The TAC loosely associates the Defendants but fails to allege an agreement to defraud the government.  Because the TAC is devoid of any allegation that the Defendants conspired or agreed to defraud the government, Count Three must be dismissed.

## II.     Particularity Under Rule 9(b)

Even assuming the TAC states claims, it fails to identify the particularities of the alleged fraud.  The Eighth Circuit has stated that "[b]ecause the FCA is an anti-fraud statute, complaints alleging violations of the FCA must comply with Rule 9(b)."  *Joshi*, 441 F.3d at 556.  Every other circuit has determined that complaints under the FCA must be pled with specificity under Rule 9(b).  *United States ex rel. Kinney v. Stoltz*, 327 F.3d 671, 674 (8th Cir. 2003) (citing *United States ex rel. Totten v. Bombardier*, 286 F.3d 542, 551-553 (D.C. Cir.2002); *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir.2001); *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir.1997); *Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1476-77 (2d Cir.1995)).  Raynor makes

22

extensive arguments that Rule 9(b) does not apply in this case.  Raynor notes that 31 U.S.C. § 3129 repeatedly uses the phrase "false or fraudulent" and argues that the use of the disjunctive "or" suggests that while Rule 9(b) may apply to fraudulent claims under the FCA, it does not apply to false claims.  The relator in *U.S. ex. rel. Clausen v. Laboratory Corp. of Am., Inc.*, 290 F.3d 1301, 1308 (11th Cir. 2002), also argued that false claims under the FCA do not trigger the particularity requirements of Rule 9(b).  The Eleventh Circuit concluded that Rule 9(b) applies to false claims under the FCA because despite the disjunctive use of "false *or* fraudulent," the Supreme Court has consistently recognized the FCA as an anti-fraud statute.  *Id.* (citing *Vermont Agency of Nat. Resources v. United States ex rel. Stevens*, 529 U.S. 765, 781 (2000); *Neifert-White Co.*, 390 U.S. at 233).  As noted in *Joshi*, the Eighth Circuit also characterizes the FCA as an anti-fraud statute.  Thus, despite Raynor's statutory construction, his claims are subject to the strictures of Rule 9(b).

Rule 9(b) requires that a complaint set forth specifics regarding time, place, persons, and the fraudulent nature of the alleged acts.  *See United States ex rel. Costner v. Unites States*, 317 F.3d 883, 888 (8th Cir. 2003).  Courts have dismissed FCA claims for failing to state the "who, what, when, where, and how" of the fraud.  *See id.*; *see also Joshi*, 441 F.3d at 557.  Rule 9(b) requires more than generalized and conclusory allegations.  *Joshi*, 441 F.3d at 558.  Raynor urges the Court to adopt a relaxed Rule 9(b) pleading standard to the extent Rule 9(b) is applicable, citing *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009).  In *Kanneganti*, the Fifth Circuit noted that Rule 9(b) supplements but does not supplant Rule 8(a)'s notice pleading.  *Id.* at 186.  However, the court also noted that the strictures of Rule 9(b) apply in conjunction with notice pleading.  The court

specifically stated that "Rule 9(b) does not reflect a subscription to fact pleading and requires only simple, concise, and direct allegations of the circumstances constituting fraud, which, after *Twombly,* must make relief plausible, not merely conceivable, when taken as true." *Id.* (internal quotations omitted).

Even under this "relaxed" standard, Raynor has failed to plead his claims with the particularity required by Rule 9(b). Regarding NRECA, English, Lilly, List, and Petersen, Raynor merely describes their association to CFC and makes conclusory statements about their participation and knowledge of CFC's scheme to defraud the government. The Complaint summarily states that each actor was aware of the fraudulent scheme, but it does not include any other specifics regarding the fraudulent nature of their own actions or any agreement between the Defendants to commit fraud. Similarly, the Complaint states that the Defendant accountants, Ernst, Deloitte, and Johnston, were somehow aware of CFC's fraudulent schemes based on their audits and then departed from GAAP in reporting CFC's financial situation. However, as noted in detail above, allegations of GAAP violations do not conclusively establish fraud claims without corresponding evidence of fraudulent intent. *Kushner*, 317 F.3d at 831. Last, Raynor claims that, upon information and belief, the Fitch Defendants, S&P, and the Moody's Defendants were culpable because they were also aware of CFC's fraud. Raynor's several allegations summarily state that each of these Defendants must have been aware of CFC's fraudulent activity and therefore, their own actions were fraudulent as well. However, [m]ere allegations of fraud are insufficient." *In re Navarre Corp. Sec. Litig*., 299 F.3d 735, 742 (8th Cir. 2002). Though Raynor's allegations are numerous, none of them sufficiently sets forth specifics regarding the fraudulent nature of the alleged acts of any Defendant.

24

Regarding CFC, the allegations also fall short of the requirements stated in *Joshi*. This case presents a unique situation in that the immense detail of the background allegations works against the principles of Rule 9(b). Though the questionable accounting practices are alleged in length, it is difficult to identify the "who, what, when, where, and how" of the accounting practices that allegedly resulted in fraudulent claims. For example, the TAC never makes clear whether the fraud on the government was access to FFB funds, USDA funds, or both. Further, the TAC is unclear as to how CFC committed fraud, while it was Famer Mac that allegedly violated the applicable rules and regulations. As noted above, the TAC fails to indicate how CFC's allegedly fraudulent actions would have been material to the government's decision to issue loans. In sum, the TAC alleges a massive amount of law and fact, but fails to allege the "who, what, when, where, and how" of the fraud.

## III.   Amendment

Raynor requests that to the extent the Court finds that the TAC is legally insufficient, he be given leave to amend under Federal Rule of Civil Procedure 15(a)(2). Though courts should grant leave freely as justice requires, "denial of leave to amend may be justified by undue delay, bad faith on the part of the moving party, futility of the amendment or unfair prejudice to the opposing party." *United States ex rel. Gaudineer & Comito, L.L.P. v. Iowa*, 269 F.3d 932, 936 (8th Cir. 2001). Though this case stands at an early stage procedurally, a significant amount of time has passed since its inception, and Raynor has already amended his complaint several times. Because the TAC is dismissed, in part, under Rule 12(b)(6) for failure to state a claim, any amendment would need to the change the entire character of Raynor's claims. Thus, the Court finds that amendment would be futile, and

25

would be unfair to the opposing parties, and Raynor will not be given leave to amend.

Accordingly,

    IT IS ORDERED:

    1.      The Defendants' Motions to Dismiss the Third Amended Complaint (Filing

            Nos. 117, 119, 121, 123, 130, 132, 134) are granted;

    2.      The Third Amended Complaint (Filing No. 36); is dismissed with prejudice;

            and

    3.      A separate judgment will be entered.

DATED this 15th day of March, 2011.

                                BY THE COURT:


                                s/Laurie Smith Camp
                                United States District Judge